UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )
                           )
v.                         )     CRIMINAL NO. 05-300033-MAP
                           )
DANNY ROSS               )

## DEFENDANT'S SENTENCING MEMORANDUM
### AND MOTION FOR DOWNWARD DEPARTURE

Defendant Danny Ross submits this memorandum and motion for downward departure to assist the Court in sentencing setting forth factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Here the sentence to be imposed should be designed to take account of the gravity of the offenses regarding a small quantity of drugs, the circumstances surrounding the sale to a cooperating witness, punish the defendant for committing the offenses and to deter the defendant and others from similar conduct in the future, but at the same time, to recognize that these offenses were committed while the defendant's behavior was affected to a significant degree by Mr. Ross's diminished capacity.

The reasonable goal of the criminal justice system would not be served by confining the defendant in a federal prison for 262 to 327 months. A reasonable punishment appropriate for the petitioner, which includes a significant restriction of his liberty for a time consistent with the penalty called for in the statute would be 120 months.

## Relevant Personal Background

Mr. Ross is a 29 year-old man born in Elmira, NY and raised in both Elmira and Springfield MA. He spent the first ten years of his childhood in Elmira, where violence, alcohol, drugs and extreme poverty were a part of everyday life and where he, his brothers and mother were the victims of violent domestic abuse at the hands of his father. PSR at ¶ 49, 50. The chaotic and unstable household that Mr. Ross grew up in provided little in the way of guidance and discipline. Mr. Ross's father abused alcohol and drugs, and was physically abusive to defendant's mother, the defendant recalling "seeing his mother repeatedly beaten by his father several times per week" and remembers that he and his two younger siblings were beaten also. PSR at ¶ 49. At nine years old the defendant's mother left the home and moved to Springfield MA, but left the Defendant and his two younger brothers in the home with their violent and abusive father. There the children were often left at home alone and the defendant assumed the responsibility of his two younger brothers, getting them ready for school and preparing meals. Report of Dr. Sherry page 3, attached as Exhibit "A". When their father did return home the defendant would find himself the victim of beatings at the hands of his father. His mother stated that because Danny was the oldest of the boys living at home, he often times received the brunt of his father's abuse and violence.

After one year Danny and his siblings rejoined his mother now living in Springfield, MA, but things did not get much better. Danny's mother was now living with another man who was also violent and abusive to Danny's mother and Danny himself, although the mother reports "not as badly as their father had beaten them." Report of Dr. Sherry page 4. As a result of the traumatic childhood suffered by Danny Ross, characterized by beatings, terror, hunger, neglect, abandonment and extreme poverty it was reported by his mother that he wet his bed up to age 12

2

(Report of Dr. Sherry page 2) and was too nervous to sleep because of fear of being beaten. Report of Dr. Sherry page 3. The defendant's childhood years were best summed up by Mr. Ross himself when responding to the best thing that ever happened to him growing up; he responded "Nothing that I can recall." Report of Dr. Sherry page 4.

Mr. Ross quickly succumbed to the lure of, and comfort provided by alcohol and drugs. He began using alcohol and marijuana at age 13 or 14, and later graduated to using cocaine, until he was abusing one substance or another on an almost daily basis. PSR at ¶ 65.

Mr. Ross's drug use was in large part a response to severe psychological problems which have plagued him since his terrifying and traumatic childhood. There had been a number of environmental stresses including separation from mother, violence and cruelty at home, and chronic sense of deprivation caused by his family's poverty that directly contributed to Mr. Ross's condition. Report of Dr. Sherry page 11.

## Argument

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in Blakely v. Washington, 124 S. Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000) applies to the Federal Sentencing Guidelines. United States v. Booker, 125 S. Ct. 738, 756 (2005). Accordingly, the Court made the Guidelines effectively advisory. Id. at 757. Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act as revised by Booker requires a sentencing court to consider Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well. § 3553(a). Booker, 125 S. Ct. at 757.

The primary directive in Section 3553(a) is for sentencing courts to impose a sentence

sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2.

Section 3553(a)(2) states that such purposes are:

- (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- (B)    to afford adequate deterrence to criminal conduct;
- (C)    to protect the public from further crimes of the defendant; and
- (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

- 1)    the nature and circumstances of the offense and the history and    characteristics of the defendant § 3553(a)(1);
- 2)    the kinds of sentences available § 3553(a)(3);
- 3)    the need to avoid unwarranted sentence disparities among  defendants with similar records who have been found guilty of similar conduct § 3553(a)(6); and
- 4)    the need to provide restitution to any victims of the offense. § 3553(a)(7).

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

Under 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the background, character, and conduct of the defendant which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence. This statutory language certainly overrides the now advisory policy statements in Part H of the sentencing

4

guidelines, which list as not ordinarily relevant to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. § 5H1.

In every case, a sentencing court must now consider all of the § 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY
      AND CHARACTERISTICS OF THE OFFENDER

(a) Nature and Circumstances of Offense: The investigation by the FBI's Western Massachusetts Gang Task Force of the Latin Kings street gang resulted in the FBI using a confidential informant, Julian Rios (Rios), to make drug purchases from other gang members. Rios was a senior member of the Latin Kings for a number of years, and recruited Mr. Ross into the Latin Kings street gang when Ross was only 18 years old, sponsored his membership into the gang and was responsible for Mr. Ross becoming a member of the Latin Kings street gang. At the time of Rios's cooperation and undercover activities with the FBI involving the defendant Ross, Julian Rios was second in command of the Latin Kings street gang.

Despite Mr. Rios long criminal record, consisting of convictions for drugs and violence (Rios would qualify as a career criminal under the advisory sentencing guidelines) the FBI used Rios to set up drug transactions on February 1, 2205 and February 2, 2005, transactions with the Defendant, Mr. Ross.

On or about February 1, 2005, and again on February 2, 2005 Rios approached the

Defendant for the purpose of having the defendant sell him a quantity of cocaine. At that time the defendant was not a dealer and only after repeated requests by Rios did he agree to call a drug supplier to arrange for a quantity of cocaine to be delivered to Rios. Mr. Ross's girlfriend Lisa Deleon reports that at that time he was trying to distance himself from the street gang and work to support his family. Report of Dr. Sherry page 6.

Mr. Ross's involvement with the distribution of the cocaine was a direct response to the insistence of the CW Rios to provide cocaine to him. Mr. Rios made repeated calls to Mr. Ross and it was not until he promised Mr. Ross twenty dollars that Mr. Ross submitted. Report of Dr. Sherry page 6. Rios was described as a brother figure to Mr. Ross, and was supposed to be the godfather of Mr. Ross's son. Report of Dr. Sherry page 6

(b) History and Characteristics of Mr. Ross:  As indicated above Mr. Ross's childhood and upbringing had been characterized by beatings, terror, hunger, neglect, abandonment and extreme poverty marked by disturbing , cruel and traumatic events during his life. Despite his deprived and terrifying childhood, his mother reports that he is a compassionate person and of his siblings was the most helpful and the only child she could rely on. Report of Dr Sherry – page 3. Letter from sister attached as Exhibit "B".  Mr. Ross is described by his girlfriend and mother of his five year old child, Lisa Deleon, as a caring individual that helped raise her child from a previous relationship together with the son they had together. Ms. Deleon states Mr. Ross tried to distance himself from his previous life as a gang member, and to that end the couple planned to move together to Rochester, NY. PSR at ¶ 62.

The nature of the offense in this case is similar to other substance abuse cases. The report demonstrates that Mr. Ross engaged in a pattern of destructive behavior that continued unabated

6

until his arrest and detention. PSR at ¶ 65 and 66. Mr. Ross used cocaine on a frequent basis and believes his heavy cocaine abuse before his incarceration is the reason for a number of health problems he now suffers, including memory loss, nasal pain and problems, vision problems, and feeling of being displace or distant mentally. PSR at ¶ 65.

The report demonstrates that Mr. Ross had an extremely difficult and terrifying childhood. PSR at ¶ 49, 50, 51. Though he has never participated in mental health counseling, he would benefit from counseling. PSR at ¶ 64 and Report of Dr. Sherry, page 12. Substance abuse is frequently related to other mental health problems. In addition to cocaine, Mr. Ross's substance abuse history includes alcohol, and marijuana. PSR at ¶ 65 Based on these circumstances, Mr. Ross presents as an ideal candidate for both drug and mental health treatment.

Though Mr. Ross has a significant criminal record, his record and his criminal history points almost entirely stem from his substance abuse problems. Mr. Ross received two (2) points for a 1995 conviction of attempted possession of a controlled substance. PSR at ¶ 34. Mr. Ross received two points for a 1998 conviction for distribution of cocaine. PSR at ¶ 39. Mr. Ross received three (3) points for a 2004 conviction for possession with intent to distribute cocaine.

2.    THE NEED FOR THE SENTENCE TO REFLECT RESPECT FOR THE LAW, ADEQUATE DETERRENCE, TO PROTECT THE PUBLIC AND THE NEED FOR EDUCATIONAL OR CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.

A ten year sentence of imprisonment for a person that has accepted responsibility by pleading guilty is by no means a lenient sentence. Given that this offense stemmed from r5epeated pressure from a close friend to arrange a cocaine deal rather than an effort to make

7

money through the distribution of cocaine, a ten year sentence is sufficient to promote respect

for the law and to deter the sort of conduct at issue in this case. Though the distribution of

cocaine is dangerous, the offense conduct in this case did not constitute a deliberate and

intentional effort to harm the public. It was a small amount of cocaine of little value to a person

known to Mr. Ross who was working undercover for the government and in an amount that

was consistent with personal use. Considering Mr. Ross's diminished capacity and his

substance addiction is what had driven this conduct, treatment is the most effective way to

protect the safety of the public.

As noted in the report, Mr. Ross acknowledges his drug problem and is committed to

obtaining drug treatment to conquer this addiction. PSR at ¶ 66. Based on the nature of the

offense and his expressed desire for treatment, Mr. Ross is an obvious candidate for the 500

hour residential drug treatment program offered by the Bureau of Prisons.

3.    THE KINDS OF SENTENCES AVAILABLE

Because Mr. Ross has been convicted of a Class B felony, no sentence other than

imprisonment is authorized. PSR at ¶ 79-89. Though imprisonment is the only sentencing option

in this case, the court is required to recognize that "imprisonment is not an appropriate means of

promoting correction and rehabilitation." 18 D.S.C. § 3582(a). This recognition is consistent with

the sentencing principle noted in Section 3553(a) that the court should impose a sentence no

"greater than necessary" to satisfy the statutory goals of sentencing.

4.    THE SENTENCING RANGE ESTABLISHED BY THE SENTENCING
      COMMISSION

In order for a sentence imposed under § 3553 to be reasonable, a district court must begin

with a correct determination of the guideline range. In addition to the objections raised by the Defendant to the Presentence Report, Mr. Ross further argues that in calculating the final offense level used to determine the advisory guideline range, the Court should depart down on several bases. First and foremost, the current offense level of 34 severely overstates the seriousness of the offense.  The career offender status grossly overstated the seriousness of defendant's criminal history.

I.     Mr. Ross's Criminal History Category Significantly Over-
Represents The Seriousness Of His Criminal History.

Mr. Ross's prior record is significantly less serious than that of most of persons in the career offender category or in Criminal History Category VI, and a downward departure is warranted.  Mr. Ross's career offender status distorts the seriousness of his criminal history.

Mr. Ross now moves for a departure below the ranges set by the career offender guideline based on the principal set forth in USSG §4 A1.3.  Recognizing the inadequacies of the criminal history scoring system, the commission encourages departures where "reliable information" indicates that the criminal history category "significantly over represents the seriousness of the defendant's criminal history or the likelihood that he defendant will commit further crimes."  U.S. v. Lindia, 82 F.3d 1154, 1164-65 (1st Cir. 1996).  USSG § 4A1.3 departures are "encouraged departures" under Koon v. U.S., 518 U.S. 81, 135 L.Ed.2d 92, 116 S.Ct. 2035 (1996).

Under U.S.S.G. §4A1.3, Adequacy of Criminal History Category, the sentencing guidelines states:

"There may be cases where the Court concludes that a Defendant's Criminal History Category significantly over represents the seriousness of a Defendant's criminal history

> or the likelihood that the Defendant will commit further crimes. The Court may conclude that the Defendant's criminal history was significantly less serious than that of most Defendants' in the same criminal history category and therefore consider a downward departure from the guidelines."

It is clear when the Court looks at Mr. Ross's prior record, it should conclude his actual criminal history is significantly less serious than that of most of persons in the same criminal history category, and a downward departure is warranted. Mr. Ross's criminal history category is based on four convictions that add up to 8 criminal history points when the defendant was a teenager until he was 21 years old.

To qualify for this departure, unlike other departures in Chapter Five (5) of the USSG, the Court does not have to find that there is something atypical about the record. Specifically, the Court does not have to find that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing commission." 18 U.S.C §3553; U.S. v. Lacy, 99 F.Sup.2d 108.

Because of career offender provisions, his guideline range, absent departures, is 262 to 327 months. Due to the overstatement of defendant's criminal history, and the fact that he suffered from a terrifying childhood and diminished capacity, the small quantity of the sale, and his high capacity for rehabilitation a downward departure is warranted and reasonable under 18 U.S.C.S. § 3553. (Offense level 23, which when combined with Criminal History Category V yields an advisory guideline range of 84-105 months.) PSR at ¶ 28 and 41.

Here the Court may conclude that the defendant's criminal history was significantly less than that of most defendant's in the same criminal history category and therefore consider a downward departure from the guidelines." U.S.S.G. § 4A1.3. While the defendant clearly does have other convictions, they simply do not justify, in any realistic sense, the imposition of the

full sentence called for under the advisory career offender guidelines. First, a ten-year prison term does adequately address the nature and circumstances of the serious crimes committed by the defendant. Second, the sentence takes into consideration the defendant's background, and particularly his devastatingly traumatic childhood and the ongoing psychological problems and diminished capacity resulting from that trauma and substance abuse. The sentence promotes respect for the law and will act as a strong deterrent to others tempted to commit this crime. Finally, the sentence will offer the defendant appropriate opportunities for rehabilitation to insure that when he is released he will take his place as a responsible citizen in our society.

II.     The Court Should Depart Downward Based On Mr. Ross's Diminished Capacity And Disadvantaged And Troubled Family Life

A sentencing court may depart downward where a combination of factors warrants it. See U.S.S.G. § 5K2.0 Commentary (combination of characteristics and circumstances, none of which alone take the case out of heartland, may warrant departure). See also United States **v.** Sklar, 920 F.2d 107, 1117 (1st Cir. 1990)("We do not mean to imply that factors, inadequate to warrant departure when taken in isolation, may not in combination suffice to remove a case from the heartland") (citation omitted). The combination of factors that warrants departure here includes Mr. Ross's diminished capacity, his troubled family life and his disadvantaged upbringing.

If the Court were to find that the situation presented in this case, overall, is not an ordinary one, the Court may depart from the range required by the Guidelines U.S. V. Rivera, 994 F.2d 942, 946 (1st Cir. 1993). As Guidelines Policy statement on grounds of departure notes: "circumstances that may warrant departure from the guidelines cannot, by their very

nature be comprehensively listed and analyzed in advance". U.S.S.G. §5K2.0. The First Circuit, given this understanding, has stressed the rule is one of reasonableness and that "when such unforeseen circumstances arise, the District Court will decide whether to depart and, if so, how much to depart by examining the unusual circumstances and making a judgment about what is appropriate. U.S. v. Skor, 933 F.Supp. 1108 (D.Mass. 1996).

In this case the Defendant seeks a departure with respect to the sentence. The defendant's request is based on a number of factors that takes this case "out of the heartland" and forms the basis for an encouraged departure, as has been characterized in U.S. v. Baron, 914 F.Supp. 660 (D.Mass. 1995). In U.S. v. Sclamo, 997 F.2d 970 (1st Cir. 1993), a two step analysis was recommended when downward departure from the Guidelines is requested. The Court should first ask "what features of the case take it out of the "heartland" and make it special or unusual?" U.S. v. Rivera, 994 F.2d 949 (1st Cir.1993); and, if special features are discouraged by the Guidelines, the Court should go on to decide whether the case is nonetheless not ordinary, whether the case differs from the ordinary case. Id. If the case is not ordinary, then the court may consider departing, deriving guidance from the Guidelines, but ultimately, "drawing upon experience and informed judgment." Id.

The combination of factors that warrants departure include the fact of Mr. Ross's chaotic family circumstances and the extreme disadvantage he grew up under, warrant the Court's consideration and a downward departure under U.S.S.G. § 5K2.0. See Koon v. United States, 116 S.Ct. 2035 (1996) (District Court has broad authority to depart downward on any ground, with the exception of forbidden ground); United States v. Rivera, 994 F.2d 942, 947 (1st Cir.1993).

A sentencing Court may depart for mental and emotional impairments that do not otherwise meet the criteria for diminished capacity under U.S.S.G. § 5K2.13, although diminished capacity would be applicable in this case. The language in section 5H1.3, mental and emotional conditions are not normally relevant indicates that the Commission intended these factors to play a part in some cases. Koon v. United States, 116 S, Ct, 2035 (1996)(district court has broad authority to depart downward on any ground, with the exception of a forbidden ground); United States **v.** Rivera, 994 F.2d 942, 947 (1st Cir. 1993).

There can be little doubt that Mr. Ross has labored under severe mental impairments that overlap the offense he has plead guilty to. His record reveals his struggles as a child to manage himself and his chaotic environment. Mr. Ross's anxiety and nervousness depression were so pervasive that he could not sleep and continued to wet his bed until twelve years old.

In determining whether a departure from the guidelines is warranted under 18 U.S.C. § 3663, a sentencing court may consider, any information concerning the background, character, and conduct of the defendant unless prohibited by law. 18 U.S.C. § 3661; USSG § lB1.4. Departure from the sentencing range is permitted where aggravating or mitigating circumstances exist which were not adequately taken into consideration by the sentencing commission when drafting the guidelines. 18 U.S.C. § 3553 (b). Where, as in this case, "substantial atypicalities" are shown by the Defendant, the First Circuit has recognized that a downward departure is necessary to achieve the guideline goal of imposing appropriate sentences. United States v. Carr, 932 F.2d 67,72 (1st Cir 1991.) cert denied, 112 S. Ct. 112 (1991)(Departure is permitted where special circumstances are found); United States v. Norfleet, 922 F.2d 50, 54 (1st Cir. 1990) (Departure is justified by "substantial atypicalities").

There are a number of special of special factors noted above and in the PSR and Dr. Sherry's report that transform Mr. Ross's situation into an extraordinary one meriting the downward departure.

5.        THE NEED TO AVOID UNWARRANTED DISPARITIES

A 120 month sentence  in this case would not create unwarranted sentencing disparity. The applicability of the five year mandatory minimum term of imprisonment to this case already acts a sufficient check on sentencing disparity by applying to all defendants that are convicted of this offense.

### Conclusion

For the foregoing reasons, Danny Ross respectfully requests that the Court depart downward and impose a sentence of 20 months pursuant to the statute with suitable conditions to ensure that Mr. Ross  receive mental health treatment and drug counseling and  submits that a sentence of 120 months is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED,
THE DEFENDANT

Dated: 6/21/06

By:

BERNARD T. O'CONNOR, JR.
His Attorney
BBO No. 557879
1391 Main Street - Suite 1022
Springfield, MA 01103-1610
(413) 781-5311

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED UPON
(EACH PARTY APPEARING PRO SE AND)
THE ATTORNEY OF RECORD FOR EACH
OTHER PARTY BY MAIL/BY HAND ON

6/21/06

Signature

14

EXHIBIT  A

MICHAEL SHERRY, PH.D.
#217
351 PLEASANT STREET
NORTHAMPTON, MA 01060
(413) 584-2852


PSYCHOLOGICAL EVALUATION
DANNY ROSS  (DOB: 6/30/76)
6/5/06


Atty. Bernard O'Connor, Jr. requested that I evaluate Mr. Ross, a 29 year
old man, prior to sentencing for his involvement in Criminal Action 05-
30033–MAP in the United State District Court, District of Massachusetts.

To that end, I interviewed and tested Mr. Ross on 5/29/06 and 5/30/06 at
Hampden Correctional Center at Ludlow. Testing consisted of a standard
psychological test battery, including the Rorschach, a Writing Sample and
the Personality Assessment Inventory (PAI). I also administered to Mr.
Ross three subtests of the Wechsler Memory-III. I spent 6.5 hours with
Mr. Ross. I also spoke by telephone with Mr. Ross's mother Lorraine
Kitchings and his girlfriend Lisa DeLeon.  I also reviewed material sent to
me by Atty. O'Connor including the Presentence Report written by
Richard Rinaldi, the Indictment, and additional documents.

## RELEVANT BACKGROUND INFORMATION

This information is based on Mr. Ross's report as well as the report of his
mother. Mr. Ross will be referred to as Danny in this report.

Danny is one of six children born to his mother. Five of the six children
share the same father, the man who also fathered Danny. He grew up in
the Elmira area of upstate New York. He has three older sisters (one is his
half-sister) and two younger brothers who are three and four years
younger. His sisters were often raised by other relatives or in foster homes.

Danny's father was a violent alcoholic. He never worked. When Danny's
mother lived with him in Elmira, she did not work either so there was very
little money in the family.

JUN 0 6 2006

According to Danny and his mother, his father would always return home drunk. His mother stated (and there was nothing in her presentation that led me to believe that she was being deceitful or exaggerating) that her husband would beat her with a belt, kick her down the stairs, force her into a scalding shower, and once hit her on the head with a shotgun, knocking her unconscious and sending her to the Emergency Room. She stated she often feared for her life and also was afraid that her husband, when intoxicated and enraged, could do anything to the boys. She stated that at that time Danny and his two younger brothers witnessed all of the abuse because it would happen in the home. She stated they would hear her screaming and crying. She stated her husband would yell that he was going to kill her. "The boys knew all of this." Danny stated he was always scared when his father was raging. He thought of trying to help his mother but was too afraid to intervene. She stated that during these years, she was not in her "right mind" because she was so frightened. She also could not get away because her husband would follow her wherever she went. She stated that to this day, it is painful to talk about those years and that she sees a therapist and takes medication (antidepressants and antianxiety pills) for her mental state. (She is also disabled from a neck and back injury).

Danny's mother stated that her husband would beat all of the boys with belts simply for playing and being kids, and that he singled Danny out for reasons that she could never understand. She stated the boys were hit on their arms and legs and she thought that one or two times she had to take Danny to the hospital. Danny recalled being hit by the hand, fist, stick and belt on the face, arms, legs, back and backside. "He hit us whenever he was mad or when he thought we did something wrong." Danny knew when the boys were at risk because his father would be drinking, staggering about and talking funny (His mother stated that her husband would always be saying that the Chinese were coming when he was drunk). Danny recalled the worst beating was when his father punched him in the face and slammed him against a wall. He stated one of his brothers was "beat real bad with a belt" and had welts all over his body. Danny's mother said that when her husband came home as he usually did in an intoxicated state, she would huddle the boys in a bedroom for protection. Danny stated that his mother was too frightened to try to protect them. He added: "She would sometimes try to stick up for us, but it never worked."

Danny's mother added that her husband, who was seeing many other women, would sometimes take Danny over to his girlfriends' homes. For part of the time, his father had a girlfriend who lived in the backyard.

Danny's mother stated that Danny would have trouble falling asleep and wet his bed until he was 12. Danny said he could not fall asleep many

nights because his father's yelling would awake him and that he would then be afraid of being beaten. He stated often that he was too nervous to fall asleep. He did not recall having nightmares.

Danny's father was often not home, either because he was out of the home drinking and philandering or spending time in jail and prison for charges that included Domestic Assault and Battery.

When Danny was approximately 5, his mother took him and his brothers to Syracuse for a year to get away from her husband. When they returned, the violence continued.

When Danny was 9, his mother fled *without the boys* to Springfield, MA for one year. She stated she had to escape from the violence. Danny and his brothers stayed with his father and his father's girlfriend. Danny stated he missed his mother whom he did not see for that year and did not know if he would live with her again. He said he and his brothers were often home alone and that it was his responsibility to get his brothers ready for school. He also would have to cook for his brothers. His mother said that Danny was forced to grow up too soon as a result of this experience. He stated he was happy to go to school then because it got him out of the house and away from his father. He said that while it was not easy being alone in the house, it was better than when his father returned and the violence would resume. Danny thought he was hit 2-3 times a week during this year.

During the years that he lived in Elmira, even when his mother was present, Danny stated he never went hungry but sometimes would eat whatever was in the house, like a mixture of rice, milk and sugar, "anything to keep us from feeling hungry." He stated he had few clothes. He stated that when he went to school, he felt different than all the other kids, even the poor kids, because he came from a family that had so much less. He stated in his interview with me that he realized during the interview that he felt ashamed of himself when he was in school. He stated he would sometimes get in trouble in school because he was a class clown.

Danny stated that when he was younger, he never thought about what he wanted to be when he grew up. He stated, however, that he was always afraid of becoming like his father, that his relatives would always say he would grow up to be just like him. His mother, however, stated that of all of her children, she has been able to rely the most upon Danny, that when she had surgery, he was the only one to visit her in the hospital and look after her.

Danny denied that he was ever touched inappropriately sexually, that he
never thought about killing himself when he was a child, and never tried to
runaway.

Eventually Danny's mother found an apartment in Springfield and picked
up her sons (Danny was by then 10) around the time that her husband (or
perhaps he was by then her ex-husband) was re-incarcerated. She had a
boyfriend who would also beat the boys but not as badly as their father
had beaten them. This boyfriend lived with the family in Springfield for
many years until he went to jail and died of cancer. This boyfriend was
also physically abusive to Danny's mother.

Asked what was the best thing that ever happened to him growing up,
Danny answered: "Nothing that I can recall."

Danny stated that his troubles in school began when he was in junior high
school when he was suspended many times for acting up in class and
being disrespectful to teachers. He said he was suspended once for a fight.
He stated at that time he was short (his mother corroborates that he did not
have a growth spurt until he was 17) and other kids picked on him for
being small and for wearing the same clothes to school every day. He had
to repeat 8th grade. After junior high, he went to Commerce High School
for a few months and was kicked out for reasons he could not recall. He
believes that he eventually finished either the 9th or 10th grade at
Commerce before finishing the 12th grade at Massachusetts Community
Development Institute. He recalls having teachers there that he liked.

Danny stated that he drank alcohol and marijuana for the first time when
he was 13 or 14. He tried cocaine for the first time when he was 18. He
has also tried percoset, by his report, once as well as ecstasy once during
his life. He denies using heroin or amphetamines and denies ever using a
needle. His substance use skyrocketed once he finished high school. He
estimates that he drank excessively one or two times a week, getting drunk
on 2 40oz. of beer. In his 20s, he drank even more. And in the last two
years, his drinking has been at its heaviest. In the last two years, he would
sometimes drink a case of beer at a time. While he denied ever passing
out and was not aware of having had blackouts, he stated he vomited over
100 times, always telling himself to stop drinking but never being capable
of stopping. He would drink with others and by himself. He drank usually
to get drunk because he found that to be exciting and enjoyed having a
good time. His cocaine use became the heaviest in 2005 when he would
binge usually once a week, a binge lasting for about three days. He would
spend $500-600 a week on cocaine during a four to five month period. He
would often use cocaine by himself, staying in a room where he would
often become paranoid that the police were coming after him. He liked to
combine alcohol with the cocaine, finding that if he used cocaine, he could

drink more. He would use both substances until he couldn't continue. He stated he did not like the feeling when he was using, but he could not stop himself. He was too heavily addicted. He believes that his drug use damaged his nose as well as his memory. He also would deal cocaine in order to raise money to use the drug and to earn some money for his girlfriend Lisa.

Lisa entered Danny's life about 11 years ago when he was 18 and she was 13. They were just acquaintances. At that time, he had become involved with the Latin Kings, and he still considers himself to be a member (Danny stated that he has tried to get away from the gang but has felt the pull to be part of something and to be somebody. In jail, he stated he has tried to keep his distance but since every correctional officer thought he was having gang related conversations, even when he was not having them, he decided he might as well be accused correctly so he has begun to associate again with gang members). He continued to have legal trouble (I won't review his legal trouble or his work history in detail in this report) and was incarcerated. When he was in jail in 1999, Lisa began to write to him. They became involved after he was released. He stated she has always been there for him. She had a son from a previous relationship; together they had another son. Danny stated that he has helped her raise her son as well as his own. Lisa said that once Danny started fathering her son and their son together, he tried to distance himself from gang involvement, working gainfully. "He tried to be home with just us, he was working for awhile and then his old friends came back in his life. They were always around."

Lisa stated that Danny never hit her or their sons although they would have arguments in which he would say hurtful things to her. She thought that although he was close to his mother, he never stopped being angry at her for leaving him alone with his father when he was a kid himself. She thought it was always too hard for Danny to "stop living what he saw his parents do." She commented that he told her he would often as a child go with his father to bars, watching him get drunk, get high on drugs, and get involved with ladies.

Danny stated in early 2005, he had been out of jail for about three months and had not been dealing drugs. In February 2005 he made the sale that led to his current Federal charges. In March 2005, he and Lisa decided that she should re-locate to Rochester to see if the two of them could make a fresh start; the plan was for him to follow her at some unspecified time. She thought that if they relocated, perhaps Danny could escape from the element with whom he associated and perhaps he'd be able to find a job. She said when they both lived in Springfield, they could not find a place to live, that potential landlords never called them back, and Danny couldn't find employment which depressed him. She implied that he could just not

bring himself to leave the life he knew even though he was not happy. She hoped if they made a fresh start in Rochester NY, they could find an apartment, find work and Danny might even go to college.

Even before Lisa and her sons moved to Rochester in March 2005, she says his drug and alcohol use was significant. She noticed that he would begin to get depressed because he couldn't find work and support the family and that he would then go use in order to escape the discouraged feeling of failure. Then when he was drunk and high, he would say that he wished he were dead. She said he had a very hard time expressing emotion and that when he finally expressed himself, he could not manage the feeling. She spoke with him about going for counseling, but he said he was too embarrassed to talk to someone.

While she was away, Danny's cocaine and alcohol use increased dramatically. He stated he began to use the most in early 2005 because he had fewer responsibilities (with Lisa away), he could not find a job, and he was worried about his other court cases (regarding his inability to find a job, Danny stated that he has held various jobs over the years but since he has a more significant criminal record, it has become harder to find employment. He stated he took courses to help him prepare a resume and prepare for an interview but has not benefited). He was incarcerated in June 2005 for Possession with Intent to Distribute---School Zone and once inside Ludlow, learned of the Federal charges related to the sale in February 2005.

Regarding the current charges, Danny stated that in February 2005 a man he knew for 10 years came to his door and asked him if he were dealing. Danny had recently been released on bail and stated to me he was trying to avoid trouble. He told the man he wasn't dealing. The man told him he would pay him money if he found drugs for him. The man then called Danny at his sister's apartment and asked him if he wanted to "make some extra bucks." Danny agreed to help him. The man wanted three 8 balls of cocaine. "I took him to get one the first day and two more the next day." Danny stated that he wasn't dealing at the time and that he was set up by the Gang Task Force. "What threat was I? I knew it was illegal but I was just trying to make a couple of bucks." He stated he made $20 on the transaction.

Of this man who involved Danny in this matter, Lisa DeLeon said he had been a very good friend, almost a brother to Danny. She said that Rios had been in jail for a number of years during which time Danny would write to him and try to help him out. Rios was supposed to be the godfather to their son. "Danny trusted him. He still can't believe what happened."

## BEHAVIOR DURING EVALUATION

Danny was fully cooperative throughout this evaluation. He warmed up to the interview after approximately 30 minutes and spoke candidly about his childhood and life. I am fairly certain he was straightforward and honest when detailing the abuse that he experienced growing up. He was not looking for sympathy and was not trying to depict his life as being bleaker than it was. But there is no doubt that he depicted a joyless, deprived, at times terrifying early life, an account that was corroborated by his mother. The picture he gave was of a piece...beatings, fear, economic deprivation, shame at school, not fitting in, acting like a class clown, escaping into drugs, and a life of delinquency and crime. He did not try to sugarcoat any aspect of his life. And there was a depth to the interviews as he seemed to be trying to understand the way his life has unfolded.

Danny stated that he has been feeling depressed and discouraged since 2002 until the present date. "I'm miserable, sad, it's been hard to find a job, I couldn't be a family man. I feel like a loser. I'm angry at myself. I keep telling myself, I gotta do something with my life. I gotta make some money. I filled out lots of applications and couldn't get an interview. I got discouraged. Did I give up looking too early? I don't know" When he couldn't find gainful employment, he ended up seeking out his old friends on the street. .

Danny seemed more discouraged than acutely depressed. He only had a few symptoms associated with clinical depression (occasional early morning awakening but no loss of energy or appetite). However, he has often thought of suicide and has hurt himself in the past. He stated he thinks about killing himself often now although he did not have a plan and did not need to be placed on any suicide precautions. He thinks suicidal thoughts because "there's no help no matter how much I try. My life always heads toward negativity. I have nothing to do but think. I can't do nothing else." He stated he wouldn't ever kill himself because he needs to be able to help his family. However, although he has never overdosed on pills or tried to overdose on drugs, he cut himself twice, once after a fight with a girlfriend when he cut himself while drunk to make her feel guilty.

## TEST RESULTS

On tests of attention, concentration and memory, Danny performed at a below average level. His attention and concentration were slightly below average, his memory functions more impaired. My impression was that

his verbal memory may have been most impaired because he is not used to using his memory faculties in any formal way and that he was not prepared to remember rather that that he has some defect that would be attributed to his drug use. Since his memory for his life seemed within normal limits and since he performed some difficult testing tasks effortlessly, my clinical impression is that any present memory problems are related to his inner turmoil, his worry about his fate, and his lack of practice applying himself to tasks that require memory. My sense was that if I tested his memory a second and a third time, he would show marked improvement with each clinical trial as he benefited from practice.

Danny was also administered the Personality Assessment Inventory (PAI). The PAI is a 344 item true-false objective personality test in which the test taker is asked whether statements related to the experience of particular psychiatric symptoms are true for him. The responses are entered into a computer for a report. The report presents a picture of the person's level of emotional disturbance, kind of disturbance, and other personality factors. This test is one that is highly valid and reliable.

On the PAI, Danny endorsed many items in the direction that indicated he experiences himself as troubled and disturbed. It is highly likely that he presented himself in such a disturbed light because he currently is evaluating very negatively himself and his life. He is distressed by his situation and his actions in his life.

Danny's results indicate that his use of alcohol has had a negative impact on his life. His alcohol use has most likely impaired his interpersonal relationships, his attempts to find employment, and his capacity to hold a job. His use has been so extensive that he has not been able to maintain sobriety despite numerous times when he has pledged to do so.

Danny's drug use has also had many negative consequences on his life. As he has been impaired by alcohol, he has been impaired by his drug use. He reported having little ability to control the effects of drugs on his life.

On the PAI, Danny also described numerous problematic personality traits. He is likely to be quite emotionally labile, changing moods often and often feeling very angry. He is uncertain about major life issues and has little sense of direction in his life. He is often preoccupied with fears of being either abandoned or rejected by those around him. He is also quite impulsive and prone to self-destructive actions when he is feeling discouraged. He is most likely not someone who in the past was

capable of weathering painful feelings without resorting to the escape of drugs and alcohol.

The PAI also indicates that although Mr. Ross is not clinically depressed, he has a number of difficulties consistent with significant depressive experience. He is plagued by thoughts of worthlessness, hopelessness and personal failure. He openly admits to feelings of sadness, a loss of interest in normal activities, and a loss of pleasure in things that were previously enjoyed.

The PAI results show that Mr. Ross is suspicious and resentful in his relations with others. He is likely to be a hypervigilant man who often mistrusts the motives of those around him. He likely harbors feelings of resentment as a result of perceived slights and insults. He is quick to feel that he is being treated inequitably and often holds grudges against others. As a result, he may be perceived as quite hostile by others. It is unclear whether these traits are enduring characteristics of his personality or situational adjustments to his present incarcerated status.

Mr. Ross has a history of antisocial behavior. However, other features of the antisocial personality constellation, such as egocentricity, lack of impulse control, disregard for others, disloyalty and recklessness, do not present as prominent characteristic of his clinical picture. In other words, while he has committed numerous antisocial acts, he does not present with the personality of an antisocial personality disorder. This distinction is important. People with an antisocial personality disorder are, for all intents and purposes, incapable of responding favorably to life-enhancing and life-improving services(they will "use" the services to learn how to take advantage at a more sophisticated level). People, such as Danny, who have committed antisocial illegal actions most likely because of the environment they grew up in and the environment that surrounds them, do not have the profound antisocial personality disorder defect that renders them incapable of caring genuinely for others and making strides in treatment.

The PAI also indicates that Mr. Ross has been troubled by disturbing traumatic events in his life and that he continues to feel distressed by his past.

In terms of his self-concept, Mr. Ross's self-perception fluctuates between states of harsh self-criticism and severe self-doubt (his current state I believe) and periods of relative self-confidence. His self-esteem is quite fragile; he is likely to plummet emotionally in response to slights or oversights by other people.

Regarding interpersonal relationships, Mr. Ross presents as
someone who is somewhat distant. He does not appear to place a
high premium on close, lasting relationships and does not view
most social interactions with much enthusiasm. He values his
independence and may be viewed by others as aloof and
unsympathetic.

The PAI also indicates that he reports intense and recurrent
suicidal thoughts. Also he is someone who is easily angered and
may have difficulty controlling his anger. Despite all of the above,
he has substantial interest in making changes in his life and is
motivated for treatment. Despite this favorable sign of wanting to
improve his life, the combination of the problems he reported
suggests that treatment would likely be quite challenging with
many reversals.

When asked to write two paragraphs as a separate part of this
evaluation, Danny wrote the following words, which speak for
themselves:

"Being in jail I've learned that I never want to come back and how
much I miss my family. Also how much my kids need me."

"When I was younger I had a rough life and wish I had it as good
as other kids."

## CONCLUSIONS

Looking at Danny Ross now, it is easy to forget that he was once a
young, even small, boy presented with an unyieldingly violent and
abusive father and a seemingly loving mother who was at her wit's
end because she feared for her own life.

Danny witnessed the terrible physical and emotional abuse of his
mother and the physical and emotional abuse of his younger
brothers. He also experienced his own physical and emotional
abuse at the hands(literally and physically) of his father. He was
often frightened, unable to sleep because of the ragings of his
drunk father, apprehensive about what his out of control father
might do, and unprotected by his ineffectual mother. He wet his
bed until he was 12. A small boy, he could do nothing to protect
his mother or his brothers just as they could not protect him.
While older siblings were placed out of the home, Danny was
always in the thick of it. And when he was 9, his mother,
incapable of protecting herself or her family but nevertheless a

loving figure, fled for her own safety to Massachusetts; Danny and his two young brothers were left with their father, not seeing their mother for a year and unsure if they would live with her again. When Danny finally reunited with his mother when he was 10, he found himself once more physically abused, this time by his mother's boyfriend, abuse that at the time was not that significant to him only because it was less vicious than what he had experienced with his father.

To this cruelty was added a chronic sense of deprivation caused by the depth of his family's poverty. He was fed whatever was at hand; when he was alone with his father, he threw together food for himself and his siblings just so they would not feel hungry. No one looked after him. He wore the same clothes over and over to school. Despite going to a school that would not be described as affluent, he felt that amid a baseline of poverty, his level of deprivation stood out. He felt different than other kids, felt that he did not fit in, and felt ashamed.

I believe that the abuse he experienced and witnessed coupled with the shame attendant upon his family's level of poverty profoundly shaped who Danny Ross became and who he is today. A class clown and one who was defiant of authority in school (not surprising given his life with his father whom he could never defy), it is no surprise that he needed to be schooled in an alternative program. It is also no surprise that he used drugs and alcohol relatively early, and it is no surprise that whenever he was out of the little structure present in his life (school for one, his relationship with his girlfriend the other) his drug and alcohol use skyrocketed. Gang involvement (a place to belong, a place to fit in, a place to defy, a place with clear demarcations of power and authority) nearly seems inevitable with this picture of his life. As does a life of crime.

Danny Ross's childhood experiences do not in any way exonerate him from the choices he has made in life. However, many of these choices were most likely far more compelling and irresistible to him than they would have been to others; perhaps those bad choices were perceived by him as unavoidable given the way he was raised. There is also no doubt that Danny does not like his life, perhaps even hates what he is and where he is, and has great doubts about himself. He tries to anchor himself the little he can by focusing on his role as the father of two sons. But he is one who is, not surprisingly, angry, with a backlog of shameful feelings that his life has been much harder than most others. While he seems to have tried to better himself through working and through preparing

for presenting himself for jobs, he has grown discouraged that he can better himself given his past, which of course also includes now his significant adult criminal record. The lure of the street, of drugs, of alcohol are always there for him when he experiences any roadblocks to a more productive future (most likely they are there even when there are no roadblocks). He thinks of killing himself often(I did not, however, see him as an acute suicide risk or someone who needed immediate forensic intervention), an indicator of the despair he daily feels. And while he wants to talk with a counselor, I suspect it would be difficult for any counselor to encourage him without that encouragement ringing false. He wants to make sense of it all (and did some of that at a deep level during this evaluation) and change, but in this case, the combination of a terrible childhood; poor choices made as a teenager and as an adult; the ready availability of drugs, alcohol and criminal temptation; and a society with a job market that would most likely be unforgiving and not consider him twice for a position would overwhelm the likely efficacy of the thin reed of counseling. Nevertheless, were he willing to enter into counseling, with the right therapist, he would most likely be capable of better understanding his life. Yet even if he is willing to better himself, he may sense that the life deck seems stacked against him. Hence, his discouragement and despair.

Michael Sherry, Ph.D.

Marcellia D. Kitchings
21 Avon Place Apt. 29
Springfield, MA 01105

To whom it may concern:

My name is Marcellia Danelle Kitchings and I am one of the older sisters of
Danny Lee Ross Jr. I am saddened by the recent incarceration of my brother. And I have
become even sadder to learn that he may spend many years behind bars. I can tell you
that my brother is not an animal and does not deserve to be thrown in with murders and
other men that have committed heinous crimes. And this frightens me to no end. And I
cannot express in words how it breaks my spirit.

My brother is a loving man. He is a wonderful father, a caring brother and a friend
to the end. Please do not judge him by the mistakes he has made in the past. But look at
him and see what a promising future he has. In our times it seems that the courts have
made their decision in haste. You don't know the background story as to why one feels
that he may have to stoop to levels of desperation to provide for himself. And Danny has
always been a great provider. He is one who has always had my back, from the time we
were younger until now. And it just feels odd to know that he is locked up, and my mind
nor my heart has processed it yet.

I pray for you to be lenient on him during his sentencing. His son, his mother, his
brothers, and his sisters miss him dearly. He also leaves behind nieces and nephews that
ask of him constantly. Danny is a very intelligent individual. He is the only one of my
mother's six children to receive a high school diploma. And I know with the time that he
has had to think he wants to go to college or a trade school for culinary arts. I'm sure I
haven't mentioned it but he is also a wonderful cook.

It's funny to sit down and write this letter because I never in a million years
thought that I would be pleading for my brother's life. But I am. We are an unfortunate
family and do not have the means to visit if he is taken far from us. I know this is of no
concern to you, but it is to me. I want my brother home. Wouldn't you want the same
thing? How do plead for one's life? What can I say to you to make you understand how
much I love my brother? Would you release him sooner if I said that I would take him in
and be responsible for his every move? Because I would. Danny's mistakes were not a
fault of his own. It is our fault as a family. We loved him, but not enough to take him in
and he was forced to take to the street life. We wanted him around, but not to the extent
that he would ruin our own private times. I too am guilty of that action SELFISHNESS.
And I wish I could have those days back, I wish I could go back to childhood and sing
him a couple of more songs, read him a couple of more books, and gave him a couple of
more hugs. But I can't. I can only try to be here for him now. So I ask you heart and soul
please be lenient with my brother. And if possible release him in my care. I am a hard
worker with my own place, and I attend school full time.

Thank You
Marcellia D. Kitchings